[Cite as *State v. Tramble*, 2025-Ohio-2073.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

                                No. 114431

    v. :

RONNIE TRAMBLE, :

    Defendant-Appellant. :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 12, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-687431-D

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Courtney Kirven, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Francis Cavallo, Assistant Public Defender, *for appellant.*

EMANUELLA D. GROVES, P.J.:

{¶ 1} Defendant-appellant Ronnie Tramble ("Tramble") appeals his convictions for receiving stolen property and intimidation of a victim following a jury trial. Upon review, we affirm.

## I.    Facts and Procedural History

{¶ 2} In December 2023, Tramble and two codefendants, Ronnie Norris ("Norris") and Demetrius Frazier ("Frazier"), were indicted in a six-count indictment for offenses that allegedly occurred in March 2023. The indictment included the following five charges against Tramble: Count 1, tampering with records in violation of R.C. 2913.42(A)(2), a third-degree felony; Count 2, intimidation of a victim in a criminal case in violation of R.C. 2921.04(B)(1), a third-degree felony; Count 4, receiving stolen property in violation of R.C. 2913.51(A), a fourth-degree felony; Count 5, improper use of a certificate of title in violation of R.C. 4505.19(A)(3), an unclassified felony; and Count 6, possessing criminal tools in violation of R.C. 2923.24(A), a fifth-degree felony. Tramble pleaded not guilty, and the matter proceeded to trial in August 2024.

{¶ 3} The following evidence was presented by the State. First, Frazier offered testimony regarding his involvement in and knowledge of the circumstances surrounding the alleged crimes. Frazier testified that he was a codefendant, pled guilty to charges, had not been sentenced, was not promised anything for his testimony, and had nothing to gain by testifying. Frazier testified that he and Tramble grew up together and were friends. Frazier stated, that he purchased a 2013 BMW 750 (the "BMW") in 2021 for about $19,000 but transferred title to his ex-girlfriend ("Owner") in February 2023 because he kept getting pulled over by police. After Frazier transferred title to Owner, he continued to drive the vehicle.

{¶ 4} Even though the BMW was in Owner's name, Frazier decided to sell the BMW online. Frazier testified that he reduced the price of the BMW to $7,000 because he "had the car for a minute" and "it had little issues." Frazier explained that he and Owner were in a relationship at the time and talked about the BMW's sale. Frazier claimed that Owner was "cool" with selling the BMW and that he spearheaded its sale without transferring title back into his name because her work schedule conflicted with the days and times the Bureau of Motor Vehicles ("BMV") was open.

{¶ 5} Frazier explained that Tramble contacted him to buy the BMW and Frazier sold the BMW to Tramble for $7,000 in March 2023. When Tramble purchased the vehicle, Tramble's Father, Norris, was with him. Owner was not present even though the BMW was in her name. Frazier testified that he gave Tramble the title, the keys, and the car and Tramble then handed the title to Norris. Frazier testified that Tramble and Norris took the BMW and "d[id] everything after that." Frazier could not recall if Tramble asked why Owner was not present and speculated that he may have heard Owner in the background of telephone calls discussing the sale. Frazier confirmed that he sold the BMW to Tramble and identified him in open court.

{¶ 6} Frazier stated that he later received calls from Tramble and Tramble's girlfriend ("Girlfriend"), whose name Frazier believed the BMW's title was being transferred. Frazier learned that Tramble and Girlfriend were contacted by police about the BMW being "wrongfully sold." Based on his conversation with Tramble,

Frazier believed Tramble knew the BMW was stolen after its sale when police contacted his Girlfriend. Frazier testified that Tramble wanted his money back and never tried to return the BMW.

{¶ 7} On cross-examination, Frazier testified that this was his first time selling a car online and interacting with Tramble for business purposes. Frazier claimed that, at the time of the sale, there was no damage to the BMW and it had not been tampered with in any way. Frazier testified that he believed Tramble purchased the BMW with the understanding that Frazier was allowed to sell it. Frazier did not believe there would have been any indication that he did not have Owner's permission to sell the BMW. Frazier claimed that Owner was not upset immediately after he sold the BMW; rather, after a domestic dispute about a week later, Owner alleged for the first time that Frazier sold the BMW without her permission: "She was never upset until I — after the domestic dispute, that's when it was something about the car, I went to jail and now it's a court case."

{¶ 8} Next, Owner offered testimony about her relationship with Frazier and the circumstances surrounding the BMW's sale. Owner testified that she and Frazier dated for about four months and broke up in March 2023. Owner explained that Frazier transferred the BMW from his name to hers in February 2023 after he damaged her previous vehicle. Owner did not pay anything for the BMW and title was transferred after she and Frazier filled out forms, signed paperwork, and made the required payments at the BMV. Thereafter, Owner drove the BMW often and it became her primary vehicle. However, at the time of the trial, Owner no longer had

possession of the BMW because Frazier sold it without her knowledge. Owner confirmed that she and Frazier discussed selling the BMW and transferring title back to him for those purposes, but any sale was conditioned upon Frazier paying for the repair of her damaged vehicle, which never occurred. Owner stated that she had no part in the BMW's sale: she did not know anything about the sale, was not present for the sale or transfer of title, did not fill out or sign any paperwork, and did not receive any of the sale's proceeds.

{¶ 9} Owner learned that Frazier sold the BMW during an altercation between them. After Frazier told Owner that he sold the BMW, Owner began investigating the matter and learned that the BMW was registered to someone she did not know. Owner also learned that Tramble was involved in the BMW's sale after Tramble contacted a mutual cousin. After charges were filed, Tramble also contacted Owner. She explained:

> [OWNER:] Well, when he reached out to the cousin, she ended up saying that he just wanted to discuss the car because he didn't know what was going on. She ended up calling us on three-way, we ended up talking. I told him everything as far as the altercation and that I did not have knowledge that he was selling it. He told me that he was going to take it to get the car fixed, the oil changed and whatever other things that needed to be fixed on the car. And I tried to ask him back for the car, like, try to at least keep it between us, like, "Hey, are you willing to give the car back to me because I had no knowledge, my car was damaged, that's why he gave me this car." And we talked, he said he would try to reach out to Frazier.

(Cleaned up.) Despite this information, Owner testified that Tramble never offered to return the BMW.

{¶ 10} Owner recorded one of the calls she had with Tramble and saved it "just in case." The nearly 44-minute audio recording was played in its entirety for the jury.[1] During the call, Tramble stated that detectives were making calls about the BMW's sale. Tramble then explained how he became involved in the transaction. According to Tramble, Frazier told him that he was selling the BMW before his fallout with Owner. Tramble stated that he "was around" when Frazier bought the BMW, knew what Frazier paid for it, questioned why Frazier was selling it, and told Frazier that he was interested in buying it. According to Tramble, Frazier told him that he had to get the title from Owner's house, and it was difficult for Owner to go to the BMV because of her work schedule. Tramble stated that he wanted to do "everything legit-wise" but, because he knew Frazier from the neighborhood, he told Frazier that he only needed the title since his father, Norris, had friends that were notaries and at the license bureau. Tramble explained that he and Norris "already knew it was [Frazier's]" but when Frazier brought the title, Norris looked it over, asked whether Frazier's "girl [was] cool," and confirmed that any notes on the BMW were paid off. Tramble paid Frazier for the BMW and had trouble getting in contact with him thereafter. Tramble explained that he transferred the BMW's title into Girlfriend's name with Norris's help, who acted as Girlfriend's power of attorney, since he sold cars, "kn[e]w all the ins and outs," and had friends.

---

[1] A transcript of the recording was not provided. However, this court was able to discern the call's content and quote relevant portions of the conversation.

{¶ 11} During the recorded call, Tramble stated that Frazier eventually contacted him, informed him that he had been in jail, and explained the dispute he and Owner were having. Tramble claimed that Frazier never told him that the BMW was in Owner's name and later stated that he transferred title one week prior because he kept getting pulled over by police. Tramble claimed that he bought the car under the questionable circumstances because he knew Frazier, did not know anything about "the situation," and believed "it was okay for us to go about what we [were] doing" since Owner could not make it to the BMV.

{¶ 12} Throughout the recorded call, Owner explained to Tramble that Frazier transferred title to her because she needed a vehicle and Frazier damaged hers. Owner told Tramble that she believed everything was planned: the BMW's license plates were expiring; Frazier inquired about the title and knew where she kept important documents; and Frazier told her that he wanted the title to renew the license plates since it was difficult for her to go to the BMV. Owner also told Tramble that she believed Frazier was taking the BMW to the shop but sold it instead. Owner told Tramble that she did not know Frazier was selling the BMW and they only discussed selling the BMW "down the line," after her damaged vehicle was repaired and she transferred title back to Frazier. Owner further stated that she understood Tramble's perspective, but she was without a vehicle and did not receive any money from the BMW's sale. Owner repeatedly stated that she was not trying to get back at Frazier; she just needed a mode of transportation, whether that be the BMW or money to fix her damaged vehicle.

{¶ 13} In response, Tramble claimed that he bought the car "under the circumstances" because he knew Frazier, did not know anything about "the situation," and "it was okay for us to go about what we [were] doing" since Owner could not make it to the BMV. Acknowledging that fraud and forgery occurred, Tramble repeatedly expressed concerns regarding the potential consequences Norris, Norris' friends, and Girlfriend could face. Tramble wanted to have a sit-down with Frazier and Owner so that they could figure out the issues with the vehicle. Tramble also wanted Owner to handle the BMW "accusations" differently since money, family, and reputations were on the line. Noting that he "don't take no l[osse]s," Tramble said that he wanted to pressure Frazier into either returning his money or providing him with another vehicle and insisted that Owner needed to "quit going forth in court" and "let the streets handle it."

{¶ 14} Throughout the recorded call, Tramble explained that he questioned who Owner was after detectives started calling and initially believed she was "a broad trying to get loaded." Before doing his "homework," Tramble planned to "pull up" and "protect what's going on." Tramble said, "We was on our way to pulling up at your house to be 100. . . . We was going to do it yesterday. But I'm like, you know what, . . . we going to do it today. . . ." Instead, Tramble searched for the Owner on Facebook, noticed that they shared friends and family, contacted a mutual-family member, and learned that he and Owner were related. Tramble stated that if no one knew Owner, he "was just going to pull up at [her] house . . . [be]cause [he] already got all the information. . . ."

{¶ 15} Owner offered testimony as the recorded call was played. Owner confirmed that it was difficult for her to go to the BMV but claimed that she had no plans on going or doing any paperwork to sell the BMW. Owner testified that despite Tramble's insistence that he did not know the BMW was in her name, the paperwork included her name even more so than Frazier's name. Owner reiterated that she had no part in signing the BMW over to Girlfriend and never met with Norris or participated in the transfer. Tramble acknowledged this during the recorded call. Owner stated that Frazier was able to sell the BMW without her knowledge because he knew where she kept the title. Owner testified that she believed Tramble knew that the BMW was stolen and it belonged to her but never offered to give it back despite admitting as much during the recorded call; rather, he offered to have a sit-down and contacted Frazier.

{¶ 16} Owner further testified that she heard Tramble state throughout the call that he was doing his homework and looking up her address and family. Owner also heard Tramble state that he knew where she lived. Owner claimed that Tramble made several statements threatening to come to her home and insisting she drop the charges. Owner explained that she interpreted those statements as intimidation threats "[b]ecause he was saying he was going to be pulling up" and "pulling up" is a common term that typically means "trying to harm someone." As a result, Owner believed she, her family, and her home were "possibly in harm's way" and she wanted "nothing else to do with it."

{¶ 17} On cross-examination, Owner acknowledged that Tramble did not come to her home and said he would not "pull up" after he found out who she was; however, that did not reassure her or take away any of her fear since she considered herself a distant relative at best. Owner testified that she recorded two telephone calls with Tramble within about one week of each other and did not tell him she was recording. Owner stated that the nature of both calls were the same, the only difference being that Norris was on the other call.

{¶ 18} Finally, former BMV investigator Raymond J. Palermo ("Palermo") offered testimony regarding his investigation of the BMW's sale. Palermo received the case in March 2023 after Owner reported that the BMW was transferred out of her name without her involvement or permission and that she did not know any of the parties involved. Palermo contacted Owner and Girlfriend; learned that neither of them were present during the transaction or involved in the BMW's sale; and identified Frazier, Norris, and Tramble as suspects. After interviewing Owner, Palermo also learned that the signature on the title document did not belong to the Owner and was in Frazier's handwriting. Palermo further testified that the signature did not match those on Owner's driver's license or the BMW's prior title. Palermo also interviewed Girlfriend and learned that "[s]he was involved only in the sense that her name and information w[ere] being used" and was not present, or even in the area, when the title document was executed. Instead, Palermo believed Norris filled out power-of-attorney forms so he could transfer the BMW's title. Palermo was not able to locate any of the individuals involved with forging the signatures

transferring title, but believed Frazier was responsible for forging Owner's signature and Norris was responsible for forging Girlfriend's signature on the power-of-attorney form.

{¶ 19} During his investigation, Palermo discovered Tramble's license was suspended, which gave Tramble a reason to transfer the BMW into Girlfriend's name. Palermo explained, "[U]sually what people would do if they have [p]ower of [a]ttorney and . . . vehicles titled to different names, so that they could still get registration while they're being suspended — or while their privileges are suspended." Palermo also obtained the recorded call between Owner and Tramble and transcribed it in his report. Palermo testified that Tramble called him in April 2023. Palermo believed that "[Tramble] was trying to indicate that the case was resolved and there [were] no issues anymore to investigate," recalling: "He said there w[ere] no more issues with the BMW and the girl that was having a problem no longer wants to pursue it." After speaking with Tramble, Palermo followed up with Owner, who still wanted to pursue the investigation. Palermo testified that, to his knowledge, the BMW was never returned to Owner.

{¶ 20} The State rested and the following exhibits were admitted without objection: certified copies of various title documents transferring ownership of the BMW to Frazier in 2021, from Frazier to Owner in February 2023, and from Owner to Girlfriend, also in February 2023; receipts from the title transfers from Frazier to Owner and Owner to Girlfriend; the audio recording of the call between Owner and

Tramble; and Tramble's driver's license photo. The defense moved for acquittal under Crim.R. 29, and the trial court denied the motion.

{¶ 21} Tramble then testified in his own defense, immediately addressing his prior convictions for drug possession, attempted having weapons while under disability, and theft. Tramble explained that he and Frazier grew up in the same neighborhood and were closer when they were children. Tramble testified that he was involved in a transaction with Frazier involving a vehicle. Tramble claimed that he knew Frazier had a girlfriend at the time but did not know her name, stating, "I don't even know her name now, seeing that she just got off the stand, I still don't know her name."

{¶ 22} Tramble then described how he became involved in the BMW's sale. Tramble testified that Girlfriend indicated that she wanted him to purchase a vehicle for her and he began looking for a car as a result. Tramble testified that he acted as an advocate for Girlfriend when he and Norris went to look at the BMW. Tramble contacted Norris regarding the transaction because he buys and sells cars for a living on his own Facebook page. Tramble had no knowledge regarding Norris' business or how to buy or sell cars. Tramble did not believe Girlfriend's absence was troublesome since they successfully purchased other vehicles from Norris under similar circumstances. Throughout his testimony, Tramble emphasized that his involvement was limited to finding the BMW. Tramble claimed that when the transaction occurred Frazier handed the title to Norris, not to him, and denied signing any documents.

{¶ 23} According to Tramble, a detective or investigator contacted Girlfriend after the transaction and that was "how we knew about the car situation." Tramble admitted that he spoke to the investigator but denied that he indicated the situation was resolved: "I never, I never, I never — I don't know if he talked to my father, but I never talked to him about no situation being resolved. That's what I was the only thing, I was flabbergasted because I'm, like, dude, saying I said that, and I never had that conversation."

{¶ 24} Tramble further testified that he had two or three conversations with Owner to negotiate, however, they were unable to reach a resolution prior to his indictment. Tramble addressed his statements about "pulling up" to Owner's home, claiming he was mad about the situation but did not mean any harm; rather, he just wanted to "talk to her":

> I said it in the [recorded call]. I said, I was going to come to [Owner's] house and have a conversation with [her] to let [her] know what [she] and [Frazier] got going on is affecting innocent people that's in a blind, in oblivious of everything that's transpired. We came with a title already signed with [her] name. We don't know who signed it. We didn't force, we didn't come break into [her] house. . . . I was getting an understanding with her because all this stuff was happening, the investigator keep calling [Girlfriend].

Tramble also addressed his statements about "not coming to court," stating: "I just meant by, like, not come to court as far as prosecuting people that don't have nothing to do with [her] and [Frazier's] situation. And we'll try to figure it out and come to an agreement, for me, you, and [Frazier] . . . ."

{¶ 25} On cross-examination, Tramble claimed that he technically did not purchase the BMW because "[he] purchased it through [Girlfriend]" and his job was only to make sure it was a good deal. Tramble agreed that the BMW was worth much more than the listing and purchase price. Despite only paying a fraction of the BMW's worth, Tramble never thought he should ask questions. Instead, Tramble told Frazier that he wanted to buy the car and set up the transaction. Tramble testified that he gave Frazier half of the money to remove the listing from Facebook and came into possession of the BMW's title when he gave Frazier the other half. At one point, Tramble claimed that he "never got the title. [Norris] got the title." Shortly thereafter, Tramble stated: "After I gave him the other half, he gave me the title." Tramble further testified that he never verified whether he received the correct paperwork for the BMW and, admittedly, never took steps to ensure the transaction was legal and sound. Because he did not look at the paperwork, Tramble insisted that he did not know the BMW was stolen or registered to Owner at the time of the transaction. Tramble acknowledged that he eventually learned that the BMW was stolen and registered to Owner "through the phone call with the detective."

{¶ 26} During cross-examination, Tramble testified that he contacted Owner after he learned the BMW was stolen to avoid charges. Tramble admitted that during the recorded call he acknowledged that the BMW legally belonged to Owner and that forgery, fraud, and illegal conduct occurred. Tramble further admitted that he kept talking about "pulling up" on Owner's house throughout the call and claimed that "we was supposed to all talk to try to come up with a solution, but we started

talking over the phone after we had trust with the family that it was family involved, we just said, forget it, we ain't got to go face to face." Tramble claimed that he did not mean any harm.

{¶ 27} Finally, Tramble testified that he felt like "they was trying to rob me at first" because "we bought a car, just like [Frazier] said, she used to be in the background of the phone conversations of going to the BMV." Tramble claimed that Owner was lying during her testimony. Tramble further asserted that he never called Palermo and does not have his phone number. Finally, Tramble testified that he never tried to give the BMW back, noting, "Didn't nobody say they was giving me my money back."

{¶ 28} The defense rested and renewed its Crim.R. 29 motion for acquittal, which was denied by the trial court. The parties then began their closing arguments. Tramble disrupted the closing arguments on multiple occasions by speaking. The trial court repeatedly warned Tramble that he must remain silent or he would be removed from the courtroom; asked Tramble if he understood; and advised that if Tramble wished to communicate with defense counsel, he must do so in writing. Tramble did not heed the trial court's warnings and continued his outbursts. As a result, Tramble was escorted from the courtroom by a deputy sheriff after the conclusion of the defense's closing argument and prior to the State's rebuttal.

{¶ 29} During a subsequent sidebar, the defense objected to Tramble's removal and requested that he be allowed to remain in the courtroom for the duration of the trial. The State deferred to the trial court, noting, "He's clearly

causing a disruption to the Court as well as the jury." The defense's objection was noted for the record. The trial court stated:

> He was repeatedly cautioned. He also repeatedly showed he was unable to obey the instruction of the Court. It was with great reluctance, as I said I sent him from the court, but I didn't see a better way around it. He should not be bound or gagged in the jury's presence, that would be extremely prejudicial and I would not order that except in extreme cases. I think as he has heard the arguments of counsel for both the State and the defense up to this point, very capably offered on both sides, if I may say, it will not substantially prejudice the interest of the defendant to not hear the State's rebuttal close. I would ask defense counsel to please take careful notes and they may share them with their client or the defense may ask for a transcript of the State's rebuttal close and provide it to their client. But as he can play no meaningful, in fact, he ought not to play any meaningful role while the prosecution is offering its rebuttal close, I think on balance, it best that he be kept from the courtroom until the conclusion of the State's rebuttal close. I will permit him to return for the reading of the jury instruction. But if there is any further incident, underline any, then he will again be removed from the courtroom.

The trial court asked whether the defense's concerns were addressed, and defense counsel acknowledged that they were.

{¶ 30} After the State's rebuttal, defense counsel claimed that he would speak to Tramble but had concerns regarding Tramble's return to the courtroom: "I don't know if he's emotionally stable at this moment. My fear is that if we bring him back into the courtroom, he still will not behave accordingly, and I think that, in a sense, might be more prejudicial." Upon speaking with Tramble, defense counsel claimed that Tramble was "in a better state of mind," apologized on behalf of his client for "his outbursts of emotion," and expressed his belief that Tramble could "remain in the courtroom without causing any distraction." The trial court then

addressed Tramble and confirmed that he would not cause further disruption, noting that such conduct was prejudicial to Tramble's own interests. Tramble was permitted to return to the courtroom for the reading of the jury instructions, which included a cautionary instruction regarding Tramble's behavior and how he "behaved himself thereafter." (Journal Entry, Aug. 16, 2024). Defense counsel requested the State's rebuttal transcript, and the trial court stated that it would be provided as expeditiously as possible.

{¶ 31} Ultimately, the jury found Tramble guilty of intimidation of a victim in a criminal case and receiving stolen property, as charged in Counts 2 and 4 of the indictment, and not guilty of tampering with records, improper use of a certificate of title, and possessing criminal tools, as charged in Counts 1, 5, and 6 of the indictment. At a later sentencing hearing, the trial court heard from Tramble, the State, and Tramble's mother and imposed the following sentence: 36 months on Count 2 and 10 months on Count 4 to be served concurrently for "a minimum prison term/aggregate prison term of and a maximum prison term of 36 month(s) at the Lorain Correctional Institution" with up to 2 years of postrelease control at the discretion of the parole board. (Sentencing Entry, Sept. 11, 2024.)

{¶ 32} Tramble appeals, raising three assignments of error for review.

### Assignment of Error No. 1

There was insufficient evidence produced at trial to support a finding of guilt on all counts.

**Assignment of Error No. 2**

The jury lost their way by finding [Tramble] guilty against the manifest weight of the evidence.

**Assignment of Error No. 3**

[Tramble] was denied his fundamental right to be present during all stages of the trial pursuant to the Sixth and Fourteenth Amendments to the U.S. Constitution and Article 1 Section 10 of the Ohio Constitution.

## II. Law and Analysis

### A. Sufficiency and Manifest Weight of the Evidence

{¶ 33} For ease of analysis, we address Tramble's first and second assignments of error together. In his first assignment of error, Tramble challenges the sufficiency of the evidence, claiming that the State's own witnesses failed to establish the fundamental elements of the crimes charged. In his second assignment of error, Tramble argues that his convictions were against the manifest weight of the evidence and the jury lost its way in finding him guilty.

{¶ 34} Sufficiency of the evidence and manifest weight of the evidence are two distinct concepts: "'sufficiency is a test of adequacy'" while manifest weight depends on the evidence's "'"effect in inducing belief.'"'" *In re Z.C.*, 2023-Ohio-4703, ¶ 13, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997), quoting *Black's Law Dictionary* (6th Ed. 1990).

{¶ 35} A challenge to the sufficiency of the evidence supporting a conviction requires a reviewing court to determine whether the State has met its burden of production at trial. *Thompkins* at 390. When reviewing a sufficiency challenge, an

appellate court "examine[s] the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 36} During its review for sufficiency of the evidence, an appellate court does not assess whether the State's evidence is to be believed, "but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins* at 390. Indeed, when evaluating evidence's sufficiency, a reviewing court does not contemplate witness credibility or weigh the evidence; rather, "the reviewing court assumes that witnesses testified truthfully and evaluates whether that testimony, along with any other direct or circumstantial evidence presented at trial, satisfies each element of the offense." *State v. Haskins*, 2024-Ohio-5908, ¶ 37 (8th Dist.), citing *State v. Young*, 2022-Ohio-3132, ¶ 47 (8th Dist.), and *Cleveland v. Clark*, 2024-Ohio-4491, ¶ 37, 39 (8th Dist.) (noting that a challenge to the sufficiency of the evidence presents a question of law, not fact).

{¶ 37} "But 'even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re Z.C.*, 2023-Ohio-4703 at ¶ 14, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12. Unlike a sufficiency challenge, which questions whether the State has met its burden of production, a manifest-weight

challenge questions whether the State has met its burden of persuasion. *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.), citing *Thompkins,* 78 Ohio St.3d 380 at 390. In order to evaluate whether a judgment or verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving conflicts and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Jordan*, 2023-Ohio-3800, ¶ 17, citing *Thompkins* at 387 and *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983).

{¶ 38} The Ohio Supreme Court has repeatedly held that "[a] manifest-weight challenge should be sustained "'only in the exceptional case in which the evidence weighs heavily against the conviction.""'" *State v. Nicholson*, 2024-Ohio-604, ¶ 71, quoting *Thompkins* at 387, quoting *Martin* at 175; *State v. Hundley*, 2020-Ohio-3775, ¶ 80. "'[A] defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial.'" *State v. Kilton*, 2019-Ohio-87, ¶ 20, quoting *State v. Mossburg*, 2013-Ohio-1664, ¶ 22 (8th Dist.). Nor is a conviction against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over the defendants. *State v. Wells*, 2021-Ohio-2585, ¶ 40 (8th Dist.), citing *State v. Williams*, 2018-Ohio-3368, ¶ 67 (8th Dist.).

{¶ 39} With these concepts in mind, we review Tramble's convictions for receiving stolen property and intimidation of a victim to determine 1) whether

sufficient evidence was presented and 2) whether the convictions were against the manifest weight of the evidence.

**1. Receiving Stolen Property**

{¶ 40} Tramble was convicted of receiving stolen property in violation of R.C. 2913.51(A). The statute provides, "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." R.C. 2913.51(A).

{¶ 41} Tramble does not dispute that a theft offense was committed. Rather, Tramble argues that none of the evidence establishes that he took possession, retained, or disposed of the BMW. Tramble claims that he was simply the "middle-man" who arranged the sale between Frazier, the seller who held himself out to be the titled owner of the BMW, and Girlfriend, the new purchaser, and asked Norris to handle the title paperwork, a facet of the purchase process that he had no part in either. Tramble further argues that none of the evidence establishes that he knew or had reason to know that the BMW was stolen since Frazier acted like he had the legal right to sell the vehicle and nothing occurred during the transaction to suggest otherwise.

{¶ 42} Regarding the statute's first element — receiving, retaining, or disposing of property — we note that possession of stolen property for purposes of R.C. 2913.51 may be constructive as well as actual. *In re S.C.*, 2014-Ohio-3908, ¶ 19 (8th Dist.), citing *State v. Hankerson*, 70 Ohio St.2d 87 (1982), syllabus. "Constructive possession exists when an individual knowingly exercises dominion

and control over an object, even though that object may not be within his immediate physical possession." *Id.*, citing *id.*; *State v. Dean*, 2021-Ohio-766, ¶ 24 (6th Dist.), quoting *State v. Emery*, 2013-Ohio-208, ¶ 17 ("'[A] generally accepted definition of 'receive' is to acquire control in the sense of physical dominion over or the apparent legal power to dispose of said property.'").

{¶ 43} Moreover, this court has defined "retain" as "'to continue to hold, have, use, recognize, etc., and to keep.'" *State v. Evans*, 2020-Ohio-3968, ¶ 90 (8th Dist.), quoting *State v. Steward*, 2003-Ohio-4082, ¶ 10 (4th Dist.). Since "retain" is included in R.C. 2913.51(A), "[t]he crime of receiving stolen property does not require that a suspect, immediately upon receipt, recognize the property as stolen. Rather, it is sufficient that at some point after receipt, the recognition occur." *State v. Ready*, 143 Ohio App.3d 748, 760 (11th Dist. 2001) ("[E]ven if the suspect was unaware that the property was stolen at the time of receipt, the suspect would still be guilty if, after learning the true nature of the property, he or she retains it.").

{¶ 44} Next, we turn to the offense's mens rea component: "knowing or having reasonable cause to believe." R.C. 2913.51(A). "Knowing" has been defined as follows:

> [A] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B). Alternatively, the State must prove that a defendant had "reasonable cause to believe that the property has been obtained through commission of a theft offense." R.C. 2913.51(A). This court has consistently held that, "'absent an admission by a defendant, whether there was reasonable cause for a defendant to know if an item was stolen can only be shown by circumstantial evidence.'" *State v. Simpson*, 2009-Ohio-6301, ¶ 22 (8th Dist.), quoting *State v. Prater*, 2002-Ohio-5844, ¶ 9 (8th Dist.), citing *State v. Hankerson*, 70 Ohio St.2d 87, 92 (1982). We have further held that "the phrase 'reasonable cause to believe' as it is used in R.C. 2913.51(A), imposes a duty upon those coming into contact with possibly stolen items to examine fully and use all facts accessible in order to determine whether the property was stolen." *Id.* at ¶ 23, citing *Guy v. McCartney*, 2002-Ohio-3035, ¶ 25 (7th Dist.), citing *State v. Bundy*, 20 Ohio St.3d 51, 53 (1985). Therefore, "'[a] person may not blindly enter into a tainted transaction and escape the consequences by a later claim of ignorance.'" *Id.*, quoting *State v. Reinke*, 1992 Ohio App. LEXIS 5217 (9th Dist. Oct. 7, 1992), citing *Bundy* at 53.

{¶ 45} After thorough review of relevant caselaw and the record before us, we find that Tramble's receiving-stolen-property conviction is supported by sufficient evidence. The testimony and evidence presented at trial establishes that Frazier told Tramble that it was difficult for Owner to go to the BMV due to her work schedule prior to the BMW's sale. If Frazier was the registered owner of the vehicle, Owner's inability to go to the BMV would have been of no consequence. This suggests that Tramble was aware the BMW did not belong to Frazier when he purchased it.

{¶ 46} The evidence presented further establishes that Tramble questioned Frazier's reduced price for the BMW; Owner's name was on the BMW's title; Owner was not present when the BMW was purchased; and Tramble did not review any documents. Reviewing this evidence in a light most favorable to the State, this evidence demonstrates that Tramble did not fully examine or use all facts accessible to determine whether the property was stolen and, instead, blindly entered into a tainted transaction.

{¶ 47} The State also presented evidence that Frazier gave the title, keys, and BMW to Tramble and Tramble then gave the title to Norris. Frazier claimed that Tramble and Norris took the BMW and "d[id] everything after that." If believed, this evidence establishes that Tramble exercised enough dominion, control, and apparent legal power over the BMW to recruit and direct Norris to transfer title from Owner to Girlfriend without either being present.

{¶ 48} Finally, even if Tramble believed Owner authorized Frazier's unlawful sale of the BMW, testimony was offered that Tramble learned the BMW was stolen after the transaction occurred. Upon speaking with Tramble, Frazier testified that he believed Tramble knew the BMW was stolen after being contacted by police following its sale. Owner also testified that she believed Tramble knew that the BMW was stolen and it belonged to her. During the recorded call, Owner explained the circumstances surrounding the BMW's sale and specifically told Tramble that she neither authorized the sale nor received its proceeds. Despite this knowledge, the evidence establishes that Tramble never returned the BMW to Owner; testimony

was offered throughout trial that Tramble wanted his money back and never offered or attempted to return the BMW.

{¶ 49} After viewing this evidence in a light most favorable to the State, we find that any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Thus, Tramble's conviction for receiving stolen property is supported by sufficient evidence.

{¶ 50} Moreover, we cannot say that this is the exceptional case where the evidence weighs heavily against Tramble's conviction for receiving stolen property. Based on this record, the jury did not clearly lose its way in resolving conflicts or create a manifest miscarriage of justice when it found that Tramble received, retained, or disposed of the BMW knowing or having reasonable cause to believe that it had been obtained through the commission of a theft offense.

## 2. Intimidation of a Victim in a Criminal Case

{¶ 51} Tramble was also convicted of intimidating Owner in violation of R.C. 2921.04(B)(1), which provides:

> No person, knowingly and by force or by unlawful threat of harm to any person or property or by unlawful threat to commit any offense or calumny against any person, shall attempt to influence, intimidate, or hinder . . . [t]he victim of a crime or delinquent act in the filing or prosecution of criminal charges . . . .

{¶ 52} Tramble acknowledges that because his statements were recorded, there is no question as to the statements made; rather, the debate lies within the meaning of those statements and whether they amount to a threat. Tramble argues that he plainly told Owner that he was not going to "pull up" to her house and,

therefore, his comments did not threaten harm, much less rise to the level of an unlawful threat of harm.

{¶ 53} The Ohio Supreme Court explained that "[t]he term 'threat' represents a range of statements or conduct intended to impart a feeling of apprehension in the victim, whether of bodily harm, property destruction, or lawful harm, such as exposing the victim's own misconduct." *State v. Cress*, 2006-Ohio-6501, ¶ 39. However, R.C. 2921.04(B)(1) does not proscribe intimidation by "threat" alone; rather, it proscribes intimidation by an "unlawful threat of harm." The Ohio Supreme Court held that this statutory language is satisfied "only when the very making of the threat is itself unlawful because it violates established criminal or civil law." *Cress* at ¶ 42. Moreover, this court held that R.C. 2921.04(B) requires only that the defendant attempt to influence, intimidate, or hinder: "'[T]he defendant need only try to create fear about or try to influence or hinder the filing or prosecution of criminal charges.'" *State v. Serrano*, 2016-Ohio-4691, ¶ 44 (8th Dist.), quoting *State v. Thompson*, 2014-Ohio-1225, ¶ 16 (7th Dist.).

{¶ 54} Again, after thorough review of relevant caselaw and the record before us, we find that Tramble's intimidation conviction is supported by sufficient evidence. Our review of the record reveals that Tramble contacted Owner after he learned the BMW was stolen to avoid charges. The audio recording of the call between Tramble and Owner was played for the jury. Throughout the call, Tramble stated that he "don't take no l[osse]s" and insisted that Owner "quit going forth in court" and "let the streets handle it." Tramble made multiple comments that he did

his "homework" on Owner, her family, and her house and planned to "pull up" and "protect what's going on" before he learned that they were related.

{¶ 55} Owner testified that she believed Tramble's comments meant that she, her family, and her house were in harm's way. Owner further interpreted Tramble's comments to mean that he wanted her to stop pursuing the stolen BMW and prosecution of criminal charges. Owner explained that she interpreted those statements as intimidation threats "[b]ecause he was saying he was going to be pulling up" and "pulling up" is a common term that typically means "trying to harm someone." Owner testified that after those statements were made, she wanted "nothing else to do with it" because she did not want her and her family to be in harm's way. While Owner acknowledged that Tramble did not come to her home and said he would not "pull up" after realizing they were family, Owner explained that those statements did not make her feel any better, provide any reassurance, or minimize her fear since she considered herself a distant relative at best.

{¶ 56} Viewing this evidence in a light most favorable to the State, we conclude that the jury could reasonably find that Tramble's statements during the recorded call with Owner amounted to unlawful threats of harm and an attempt to influence, intimidate, or hinder the filing or prosecution of criminal charges. *See, e.g.*, *State v. Strange*, 2019-Ohio-4188 (2d Dist.) (affirming defendant's intimidation conviction where defendant urged his family during telephone calls to "pull up down there," "fix that," and "go take care of that," amongst other things, and finding that these statements were an attempt to hinder his prosecution and

intimidate victims since it could be inferred that the defendant wanted his family to unlawfully threaten the victims or their property with harm).

{¶ 57} Moreover, this is not the exceptional case where the evidence weighs heavily against Tramble's conviction for intimidation of a victim. Based on the record before us, we cannot conclude that the jury clearly lost its way in resolving conflicts in the evidence or created a manifest miscarriage of justice when it convicted Tramble of intimidation of a victim. While we acknowledge Tramble's testimony that he did not mean any harm and merely wanted to have a conversation with Owner, Tramble is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial or because the trier of fact chose to believe the State's version of events over his.

{¶ 58} Thus, after a thorough review of the record, we find that sufficient evidence was presented for a rational trier of fact to find that the elements of receiving stolen property and intimidation of a victim were proven beyond a reasonable doubt. We further find that Tramble's convictions were not against the manifest weight of the evidence. Accordingly, Tramble's first and second assignments of error are overruled.

**B. Right to be Present**

{¶ 59} In his third assignment of error, Tramble argues that his fundamental right to be present during all stages of trial was violated when he was removed from the courtroom during closing arguments absent accommodations allowing him to hear the proceedings.

{¶ 60} A criminal defendant has the right to be present at every stage of the criminal proceedings and trial. U.S. Const., amend. VI, XIV; Ohio Const., art. I, § 10; Crim.R. 43(A). However, Crim.R. 43(B) provides that a defendant displaying disruptive conduct may be excluded

> [w]here a defendant's conduct in the courtroom is so disruptive that the hearing or trial cannot reasonably be conducted with the defendant's continued physical presence, the hearing or trial may proceed in the defendant's absence or by remote presence, and judgment and sentence may be pronounced as if the defendant were present. Where the court determines that it may be essential to the preservation of the constitutional rights of the defendant, it may take such steps as are required for the communication of the courtroom proceedings to the defendant.

This court recognized that a defendant's right to be present is not absolute and may be forfeited by disruptive conduct, explaining:

> "A defendant can lose his right to be present at trial, . . . if after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless acts in a manner that is so disorderly, disruptive, and disrespectful to the court that his trial cannot be carried on with him in the courtroom. Once lost, the right to be present can be reclaimed when the defendant is willing to conduct himself consistently with proper decorum and respect."

(Citations omitted.) *State v. Bello*, 2020-Ohio-1506, ¶ 24 (8th Dist.), quoting *State v. Boynton*, 2018-Ohio-4429, ¶ 35 (8th Dist.). A trial court's decision to remove a defendant from the courtroom is reviewed on appeal for an abuse of discretion. *State v. Baskin*, 2019-Ohio-2071, ¶ 22 (3d Dist.), citing *State v. Dumas*, 2015-Ohio-2683, ¶ 19 (7th Dist.). A trial court abuses its discretion when its decision is unreasonable, arbitrary, or unconscionable. *State v. Hill*, 2022-Ohio-4544, ¶ 9, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 61} Our review of the record reveals that the trial court repeatedly warned Tramble throughout closing arguments that he would be removed from the courtroom if he continued his disruptive behavior. Tramble chose not to heed the trial court's warnings and continued to interrupt the closing arguments. Defense counsel later expressed concerns regarding Tramble's emotional stability, fearing that Tramble's misbehavior would continue and be more prejudicial than his absence. Tramble was removed from the courtroom for the State's rebuttal but was permitted to return for the reading of jury instructions once he was in a better state of mind. During a sidebar, the trial court noted its reluctance to exclude Tramble and stated, "I didn't see a better way around it." The trial court advised that Tramble heard the parties' closing arguments and would not be substantially prejudiced by his removal for the State's rebuttal. The trial court also ordered the State's rebuttal transcript be provided to the defense for Tramble's review as expeditiously as possible.

{¶ 62} Tramble fails to show how this accommodation was improper or prejudicial; he merely concludes that "proper accommodations were not made so that he could hear the process via microphone and speaker in an adjacent room." Tramble does not cite any caselaw directly supporting his argument that the trial court was required "to provide a speaker system or some alternate electronic means in and adjacent room." When an appellant fails to cite any legal authority in support of their claims, this court is allowed to disregard them. *See* App.R. 12(A)(2); App.R. 16(A)(7).

{¶ 63} Based on the record before us, we cannot say that the trial court acted unreasonably, arbitrarily, or unconscionably when Tramble was removed from the courtroom. Tramble was afforded the opportunity to cease his disruptive behavior and remain present for all stages of trial. Tramble lost his right to be present during the State's rebuttal after he continued to disrupt closing arguments. Following Tramble's removal, the trial court took steps to ensure that he was provided with the transcript of the State's rebuttal, the only portion of the proceedings during which Tramble was absent. Tramble has not provided any legal support to suggest that his rights were violated under the circumstances of this case. Accordingly, we decline to find that an abuse of discretion occurred and overrule Tramble's third assignment of error.

{¶ 64} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.


_____
EMANUELLA D. GROVES, PRESIDING JUDGE

ANITA LASTER MAYS, J., and
KATHLEEN ANN KEOUGH, J., CONCUR